Filed 10/2/24  P. v. Howard CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>REGINALD HOWARD, et al.,<br><br>    Defendants and Appellants. | B324178<br><br>(Los Angeles County<br>Super. Ct. No. BA240172) |

APPEALS from orders of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Remanded with directions as to Reginald Howard.  Affirmed as to Jesse Singleton.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant Reginald Howard.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Singleton.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Scott A. Taryle and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Reginald Howard and John Singleton participated in an armed robbery, during which a security guard was shot and killed. A jury convicted Howard of first degree murder and robbery. After two juries hung as to Singleton's guilt for robbery and murder, he pled guilty to voluntary manslaughter and robbery and admitted a firearm allegation. Thereafter, Howard and Singleton separately petitioned for resentencing under Penal Code section 1172.6,[1] which limited accomplice liability for murder. After evidentiary hearings under that section, the trial court denied the petitions, finding that both were major participants in the felony who acted with reckless indifference to human life.

Howard and Singleton now appeal the trial court's orders denying their petitions. Howard contends that the trial court erred by finding he was personally armed during the robbery, in contravention of a jury finding he did not use a firearm. Singleton contends that he had a right to a jury trial and there was insufficient evidence he acted with reckless indifference to human life. As to Howard, the record is unclear what the trial court found as to the firearm, and we therefore remand with directions as to him. However, we reject Singleton's contentions and affirm the order as to him.

———————————

[1]     All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

# BACKGROUND

I.     The robbery and murder

Howard and Singleton were tried together before separate juries. Others involved in the crime (Claudell Hatter, Rollin Denem, Thomas Bridges, and Wardell Joe) were tried together in a separate proceeding. Based on our review of the trial transcripts, we find the opinion affirming Howard's judgment of conviction on direct appeal (*People v. Howard* (June 1, 2007, B186175) [nonpub. opn.]) to be an accurate summary of evidence admitted at Singleton and Howard's joint trial. We therefore quote its recitation of the background, with additions noted in brackets. (§ 1172.6, subd. (d)(3); see *People v. Lewis* (2021) 11 Cal.5th 952, 972 [appellate opinion generally part of record of conviction in § 1172.6 proceedings].) We have taken judicial notice of the clerk's and reporter's transcripts from that case. (Evid. Code, § 452, subd. (d).)

"1. Prosecution evidence.

"a. The Big Saver robbery.

"On November 3, 1998, [in the late morning,] defendant Howard along with Claudell Hatter, Jesse Singleton, Rollin Denem, Wardell Joe, Tiasha Croslin and Thomas Bridges robbed a Big Saver Foods Market ('Big Saver') in Los Angeles.[2] Howard, Hatter, Singleton, Denem and Joe were members of the 69 East Coast Crips. Bridges belonged to the West Covina Neighborhood Crips, and his girlfriend Croslin used to belong to a gang in San Diego.

---

"[2]     Amar Mobley was acquitted of having participated in the Big Saver robbery.

"Gilbert D. lived close to the Big Saver.  On November 3, 1998, three cars stopped in front of his house and he watched the occupants talking together for a few minutes.  One of the cars was a blue and tan Regal.  It looked to Gilbert like the occupants of the cars were plotting something.  As he watched, three men got out of one of the cars and walked toward the Big Saver.  The cars departed, but one quickly parked again nearby.  When Gilbert walked down the street, the man inside this car avoided Gilbert's gaze in an apparent attempt to conceal his identity.  Another one of the three cars then pulled up.  Gilbert walked back home and called 911 because he thought the people in the cars were planning to rob him.  He watched as four men went into the Big Saver.  Shortly thereafter, he saw two or three people run out of the Big Saver, jump in one of the cars and drive off.  In May 2001, police showed Gilbert photo arrays.  He identified the two occupants of the Regal as Hatter and Croslin: Hatter had been driving and Croslin had been sitting in the passenger seat.

"Jose L., the assistant manager at Big Saver, was stocking shelves when he noticed three men inside the store.  Jose got suspicious because he saw the men wandering around the store without picking out any items to buy.  At one point, the men stopped and had a conversation less than 10 feet away from Jose and he was able to see their faces.  Jose then went to the upstairs warehouse and watched the men from above.  He lost sight of them as they moved toward the front of the store.  After hearing a gunshot, he went back downstairs and saw one of the men who had been roaming the store.  This man was standing behind Marissa, one of the cashiers, and pointing a gun at her head.

"In April 2001, police showed Jose a photo array and he identified Howard as one of the three men he had seen roaming around the market that day. At the trial, which took place a little more than seven years after the robbery, Jose was asked if he saw any of those men in the courtroom. Howard was being tried with two codefendants. Jose replied, 'It's been a very long time. I couldn't tell you exactly.' Asked the same question a little later during his testimony, Jose said Howard 'seems familiar.'[3]

"Marissa A. testified she heard another cashier yell for the security guard. Looking toward the front of the store, Marissa saw two men struggling with Jose Hernandez, the security guard. A third man was standing in front of Hernandez and pointing a gun at him. Marissa heard a gunshot and ran to the manager's office, but the manager locked the door before she could get inside. Then one of the men who had been struggling with Hernandez yelled at Marissa ['to get [her] ass over there.'] When she turned around, the man was pointing a gun at her. Marissa returned to her cash register, where the man ordered her to hand over the money. Because it was still early in the day, the robbers did not get more than three or four hundred dollars and some food stamps. As Marissa was emptying the register, she saw Hernandez 'on the floor' and she thought he had been shot.

---

[3] When Jose was asked why he had initially been unsure, the following colloquy occurred: 'A. When you asked me the question the first time, it seemed so but I wasn't sure. [¶] Q. What happened that made you feel more sure? [¶] A. I don't know. It just seems to me that I've seen him before, that's why. I don't know if it was perhaps in the picture as well.' Jose further explained: 'At the moment when the question was asked of me, I didn't want to say yes, but he did look familiar,' and 'I felt he was one of the people I had seen inside the store.'

5

[Carlos G. was working in the produce department that day. He noticed two young African American men looking around the store. Soon thereafter, Carlos saw a man with long hair and wearing a cap near the cash registers. The man pointed a gun at the ceiling, told everyone to get down, and fired a shot into the ceiling. The man had two companions. On hearing the gunshot, Carlos ran, and as he ran, he heard a second gunshot.]

"b. The initial 1998 investigation.

"Los Angeles County Sheriff's Detective Joseph Martinez arrived at the scene shortly after the shooting. He found Hernandez dead, lying on the floor in front of a magazine rack. Hernandez's gun was missing. His shirt, which had been removed by paramedics, had a gunshot hole just below the left breast pocket. Martinez found a hole in the magazine rack and an expended .45-caliber bullet between some magazines. He also found a bullet hole in the ceiling near one of the cash registers.

"James Carroll, a forensic firearms examiner, testified the bullet recovered from the magazine rack was a .45-caliber bullet that had probably been fired from a semiautomatic weapon. Hernandez owned a .380-caliber gun which could not have fired the .45-caliber bullet. Carroll found black sooting around the bullet hole in Hernandez's shirt, indicating the murder weapon had been pressed right up against Hernandez's body when it was fired.

"The investigation made no further progress for several years.

"c. The investigation resumed in 2001.

"Leonard Jackson was a member of the 76 East Coast Crips. He was acquainted with the people who committed the

6

Big Saver robbery. He frequently hung out with them at Hatter's house on 84th Street.[4] Two days after the Big Saver robbery, Jackson was arrested for violating parole. He had been in federal custody since March 2000.

"In October 2000, Jackson was given a 17-year prison sentence on a federal drug case. Hoping to get this sentence reduced, he told the United States Attorney in Los Angeles he had information about the Big Saver murder. Jackson was initially interviewed by Los Angeles Police Dep[artment] Detective Gregory McKnight, who was investigating another case, a March 2001 drive-by gang shooting in which Howard was a suspect. When Jackson made statements about the Big Saver case, McKnight contacted Detective Martinez, who had been conducting the Big Saver investigation. Based on identifications made by Jackson, Martinez began showing photo arrays to various eyewitnesses.

"McKnight arrested Howard in April 2001, in connection with the drive-by shooting. Under interrogation, he began to incriminate himself in the Big Saver case after McKnight falsely said Singleton had implicated him.[5] McKnight contacted Martinez, who asked him to start taping the interview. On the recording, Howard admitted his participation in the Big Saver robbery. He said someone had given him an inoperable firearm to wave around during the robbery and that he was supposed to

---

"[4]     The house belonged to Hatter's aunt, but it will be referred to as 'Hatter's house' for convenience.

"[5]     Regarding the drive-by shooting, McKnight falsely told Howard his fingerprint had been found on the suspected drive-by vehicle, and that Singleton had implicated him.

7

get money from the safe in the manager's office.  He saw Singleton and Joe fighting with the security guard; one of them shot the guard.

"After arriving at the police station, Martinez took over the questioning.  When he said he was investigating the Big Saver case, Howard said he didn't want to talk about that.  As Martinez got up to leave, Howard asked if Martinez would 'mind telling him what I had on him.'  Shown the photographs that had been identified by Jackson, Howard remarked, 'It looks like you've done your job.'  Howard then asked 'who was talking[?]'  Martinez falsely told him it was Croslin, to which Howard responded, 'Can't trust no bitch.'  When Martinez again asked if Howard wanted to make a statement, Howard said, '[W]ell, with what I had on him and with what McKnight had on him, he was looking at life in prison, so he asked . . . to call his mother, get some advice from his mother.'  After the call, Howard refused to say anything else.

"d. Croslin's trial testimony.

"Croslin testified that in November 1998, she was living with her boyfriend Thomas Bridges in Los Angeles.  Croslin previously lived in San Diego, where she had been a member of Emerald Hills, a Blood gang.  Bridges was a member of the West Covina Neighborhood Crips.  He frequently hung out with members of the 69 East Coast Crips at Hatter's house on 84th Street.  Croslin and Bridges lived on 68th Street.  Their friend Leonard Jackson lived in a house right in front of them.

"On the day of the Big Saver robbery, Croslin and Bridges went to Hatter's house.  Howard, Hatter, Singleton, Denem, Joe and Amar Mobley were also there.  Croslin heard them planning a robbery.  The plan was to use three cars.  Bridges told Croslin

8

to ride with Hatter in the blue and tan Regal. The three cars left Hatter's house at the same time. Croslin and Hatter drove to a Big Saver market and went inside '[t]o scope the place out.' They bought a few items and left. As they drove away, Croslin saw the other two cars parked on a street near the Big Saver. She could see the other members of the robbery group, including Howard. Hatter then parked the Regal out of sight of the Big Saver. He and Croslin sat there a few minutes, then drove past the Big Saver again. Croslin saw '[p]eople running out of the store,' 'covering their faces and running.'

"All the Big Saver participants met back at Hatter's house. People started arguing because someone had gotten shot during the robbery. [Denem had a wig that he wore during the robbery to disguise himself.] Howard was pacing nervously, saying, 'I shot him,' and 'I killed him, I killed him.' Hatter told Howard to shut up. Hatter said, 'You didn't kill him, you didn't kill him.' People were also complaining because the robbery proceeds were so meager. Croslin saw Leonard Jackson arrive in a car being driven by his girlfriend. Croslin left shortly thereafter and went home.

"That night, Croslin saw a report about the Big Saver robbery on the news. Police sketches of Denem and Bridges were shown. Croslin got upset when she learned the security guard had been killed. When Bridges came home, he had money and food stamps from the robbery. Croslin confronted him about the guard's death. Bridges said he and Denem were supposed to open the safe while Howard and Singleton robbed the cash registers, but that an employee locked the office door so Bridges and Denem went to the cash registers. Bridges saw Howard and Singleton 'tussling with the security guard.' A gun went off, but

9

Bridges did not see who fired it. [However, Bridges also told Croslin that Howard shot the security guard.]

"Croslin was arrested two days later in a bank robbery and she had been in federal custody ever since. She agreed to testify against her Big Saver accomplices in return for a guilty plea to manslaughter and robbery. Detective Martinez interviewed Croslin in Connecticut in May 2001, after which she was brought to Los Angeles.

"In her testimony, Croslin admitted having written letters to Hatter['s] and Bridges's mother[s] apologizing for falsely implicating Bridges and Hatter in the Big Saver robbery. Croslin wrote she had done so because the police threatened her. She was subsequently interviewed by Hatter's investigator, who prepared a statement that she signed asserting she had been the victim of police coercion. However, Croslin testified the letters she had written to Hatter['s] and Bridges's mother[s] were false. Bridges's mother had been visiting Croslin in jail and harassing her, telling her not to testify. Hatter had threatened her when they happened to be on the same prison bus: 'He told me to don't say anything else, this is a capital murder case, we're looking at the death penalty and just shut up and be quiet.' Croslin wrote the apology letters to stop this harassment. The statement she signed for the defense investigator was untrue; she had never been pressured to make statements against the defendants.

"e. Jackson's trial testimony.

"Jackson testified that on November 3, 1998, he went to Hatter's house. Because he was wanted for a parole violation, Jackson had his girlfriend drive him while he hid in the back seat of the car. When they arrived, Jackson sat up and saw three cars drive up. He saw Hatter, Singleton, Mobley, Denem, Joe,

Croslin, Bridges and Howard go into Hatter's house.  When Jackson walked into the house, he saw Howard and the others discussing the robbery and dividing up food stamps.  Hatter said, 'Man, how much money you all got.  This is all you all got?,' to which Bridges replied, 'We would have got more if [Howard] wasn't so damn trigger happy.'  Jackson testified Howard was 'stressed out' and 'pacing back and forth' during this conversation.  Howard appeared to have something heavy in his pocket which might have been a gun.

"Later that day, after Howard left, Jackson remained at Hatter's house.  He was watching television with Bridges and Denem when a news report came on about the Big Saver robbery.  Bridges and Denem said it 'was messed up' 'how the killings [*sic*] went down . . . saying that [if Howard hadn't been] trigger happy . . . the killing wouldn't have went down.'

"In March 2000, while Jackson was in federal custody, he ran into Bridges.  Bridges started talking about the Big Saver robbery.  He said there was 'never supposed to [have] been a murder,' but that Howard 'was real trigger happy.  [Howard] shot and killed the officer in the store.'  Bridges described how the robbery unfolded.  After Croslin and Hatter cased the market, Howard, Singleton, Denem and Bridges went in.  Singleton and Howard were armed and they were supposed to rob the security guard.  When the guard tried to take Singleton's gun, Howard shot him.  However, Jackson also testified that Bridges admitted he had not actually witnessed the shooting:  '[Bridges] said he heard . . . a gunshot and he ran to the front [of the store].  He said when he ran to the front, [Singleton] and [Howard] had already run up out the door.  [¶]  Q.  Could he see what was happening with the security guard?  [¶]  A.  Naw.'

"The prosecution's gang expert testified that in 1998 the 69 East Coast Crips had about 130 members. Their principal enterprises included murder, robbery, drive-by shootings, drug sales and weapons sales. When these gang members committed robberies in their own territory, they did so in order to obtain money to buy drugs, weapons and vehicles. Howard had identified himself as a member of the 69 East Coast Crips to several police officers.

"2. Defense evidence.

"Hatter's investigator, Stephen Thornton, visited Croslin at the county jail in response to the letter she had written to Hatter. Croslin told Thornton her police statements had been coerced, that Detective Martinez said she would go to prison for the rest of her life and never see her mother again. Martinez played her a tape of his interview with Jackson, and Croslin just repeated what Jackson said. Thornton later brought Croslin a written statement describing this police coercion, which she signed." (*People v. Howard, supra,* B186175.)

II.     Verdicts and sentences

Howard and Singleton were charged with crimes arising from three separate incidents. As to the Big Saver crimes, Howard and Singleton were charged with Hernandez's murder (§ 187, subd. (a); count 1) with a special circumstance allegation the murder was committed during a robbery (§ 190.2, subd. (a)(17)), two counts of robbery (§ 211; counts 2 (Hernandez) & 3 (Ayon)), and firearm and gang allegations. They were also charged with a 2001 murder (count 4) and attempted murder (count 5) and a 2006 robbery (count 6).

As relevant here, Howard's jury convicted him of the first degree murder of Hernandez with a true finding on the special circumstance (§§ 187, subd. (a), 190.2, subd. (a)(17)) and the robbery of Ayon (§ 211). His jury found not true personal gun use allegations (§§ 12022.5, subd. (a)(1), 12022.53, subds. (b), (c), (d)) but found true principal gun use allegations (§§ 12022, subd. (a)(1), 12022.53, subds. (b), (c), (d) & (e)(1)). In 2005, the trial court sentenced Howard to life without parole, plus 25 years to life for the gun enhancement, plus six years. A different panel of this division affirmed Howard's judgment of conviction on direct appeal. (*People v. Howard*, *supra*, B186175.)

Singleton's jury hung on the Big Saver murder and robbery counts, and the trial court declared a mistrial as to them. A second trial also ended with a hung jury on all three counts. In 2007, Singleton entered into a negotiated plea under which he pled guilty to voluntary manslaughter and two counts of robbery and admitted a firearm enhancement (§ 12022.5, subd. (a)). Per the minute order from the plea hearing, the trial court found a factual basis for the plea.[6] In 2007, the trial court sentenced Singleton to 23 years in prison in this case.

---

[6]     The reporter's transcript from the plea is not part of the record on appeal.

III. Postconviction petitions for resentencing

In 2022, Howard and Singleton separately petitioned for resentencing under section 1172.6. The People agreed petitioners made prima facie cases for relief because they were convicted under the felony-murder doctrine, so the trial court scheduled evidentiary hearings. At both evidentiary hearings, the parties did not offer new evidence or testimony. Instead, the People relied on the evidence presented at Singleton's and Howard's joint trial.

A. *Singleton's evidentiary hearing*

In his briefing submitted for the evidentiary hearing, Singleton, who was 17 years old when the crimes were committed, agreed that he was armed during the robbery.

At the hearing, the trial court found of "no moment" that two juries hung, so the trial court did not consider that fact. Turning to the evidence supporting its conclusion that Singleton was guilty of felony murder, the trial court noted that Singleton was at the precrime meeting. During the robbery, Singleton was present, armed, and active. Although there was some evidence Singleton may have been a shooter, the trial court did not "put much note into that." However, Singleton did not try to help the dying victim. Finally, Singleton was at the postcrime meeting where the proceeds were divided. And he destroyed evidence, namely, a car.

Based on the totality of what the trial court considered, it found beyond a reasonable doubt that Singleton was guilty of felony murder as a major participant who acted with reckless indifference to human life. The trial court accordingly denied Singleton's petition for resentencing on October 7, 2022.

B. *Howard's evidentiary hearing*

At Howard's evidentiary hearing, the trial court said it had considered the trial transcripts, verdicts, and jury instructions. It had glanced at the appellate opinion but did not consider it.

Howard's counsel argued that his client qualified for resentencing because the jury had found he was not the actual shooter. Counsel otherwise conceded that Howard was a major participant but disputed that he acted with reckless indifference to human life. In response, the prosecutor said it was not asking the trial court to find that Howard was the actual killer; nonetheless, the jury's finding did not preclude a finding that Howard was armed with and intended to use a gun.

The trial court said the jury's finding did not preclude it from finding Howard was an actual shooter. Further, the trial court did not believe Howard's "self-serving statement" that his gun was inoperable and rejected that Howard tried to minimize the risk of violence by using an inoperable gun. Howard was at the planning meeting for the robbery. He armed himself, and it was his job to hold up the security guard. Howard was also at the postcrime meeting where the robbers divided the proceeds.

The trial court therefore also denied Howard's petition for resentencing on November 3, 2022.

## DISCUSSION

I.    Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to

15

murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime.  (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).)  As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor, or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d).  (*Gentile*, at p. 842.)

Senate Bill 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder, attempted murder, or voluntary manslaughter under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law.  (*People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *Gentile*, *supra*, 10 Cal.5th at p. 847.)  A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder, attempted murder, or voluntary manslaughter under the current law.  (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt

16

whether the defendant is guilty of murder under a valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

II.     Standard of review

On appeal, we review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) We do not resolve credibility issues or evidentiary conflicts. (*Ibid.*) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Notwithstanding this standard of review, Singleton suggests that where the appeal is on a "cold record" we need not defer to the trial court's findings but may make our own. He cites *People v. Vivar* (2021) 11 Cal.5th 510 to support his argument. *Vivar* concerned section 1437.7, under which courts may vacate a conviction if a defendant shows a prejudicial error affecting the

defendant's ability to meaningfully understand the immigration consequences of a plea. *Vivar*, at page 524, emphasized that while the inquiry whether counsel's immigration advice was inadequate and prejudicial involved mixed questions, the inquiry was predominately one of law. As such, independent review on appeal was proper. The court further noted that its decision applied only to section 1437.7, and nothing it said otherwise "disturbs a familiar postulate" requiring appellate deference to the trial court's factual findings regardless of whether they are based on oral testimony or declarations. (*Vivar*, at p. 528, fn. 7.) We therefore find Singleton's reliance on *Vivar* unpersuasive to show that the substantial evidence standard of review is inapplicable. (See, e.g., *People v. Clements*, *supra*, 75 Cal.App.5th at pp. 301–302 [substantial evidence review applies even where review of § 1172.6 evidentiary hearing is from a "cold record" and distinguishing *Vivar*]; accord, *People v. Njoku* (2023) 95 Cal.App.5th 27, 42–43.)

Next, Singleton "accepts" that we must view the facts in the light most favorable to the verdict. But he suggests this principle does not apply because there was no "verdict" against him and "thus no facts concerning his involvement in the underlying crimes to view in the light most favorable to the 'non-verdict.' " However, section 1172.6 applies to pleas. (§ 1172.6, subd. (a)(2) [person who "accepted a plea offer in lieu of a trial" may petition for relief].) Singleton pled guilty to voluntary manslaughter and robbery and admitted a gun enhancement. That plea is the "verdict" for purposes of section 1172.6.

Singleton also suggests that the trial court could not consider the trial record because the jury hung as to his guilt and

he entered into a *West* plea.[7]  A *West* plea of nolo contendere is one that does not admit a factual basis for the plea.  (*People v. West* (1970) 3 Cal.3d 595; *In re Alvernaz* (1992) 2 Cal.4th 924, 932.)  The plea is a generic one that does not establish a theory of murder liability or admit elemental facts necessary to an enhancement.  (*People v. Estrada* (2024) 101 Cal.App.5th 328, 338.)  While Singleton's generic plea did not establish or admit any specific facts, that is irrelevant to whether the trial court could consider the trial transcript.  The statute expressly provides that the court "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law."  (§ 1172.6, subd. (d)(3).)  The trial court therefore could consider the record of conviction, including the trial transcripts from Singleton and Howard's joint trial.

III.    *Bank/Clark* factors

The trial court found that Howard and Singleton were guilty of felony murder as major participants in a crime who acted with reckless indifference to human life under current law.  This area of law has its genesis in two United States Supreme Court cases:  *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137.  *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime,

---

[7]    The reporter's transcript of the plea hearing is not available, and the minute order from that hearing merely states that the trial court found there was a factual basis for the plea. We will therefore assume this was a *West* plea.

19

was not present when the murder was committed, and had no intent to kill.  (*Enmund*, at pp. 798, 801.)[8]

In contrast, *Tison v. Arizona*, *supra*, 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison.  The defendants gave them guns, and the group later kidnapped a family of four.  The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager.  (*Id.* at pp. 139–141.)  The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life."  (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements.  *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant."  The court listed various factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What

---

[8]  This division relied on *Enmund* to reverse the true finding on the special circumstance allegation as to Wardell Joe, a getaway driver during the Big Saver crimes.  (*In re Joe* (Sept. 15, 2016, B275593) [nonpub. opn.].)

awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*. Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark*, *supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's

propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].)

IV.    Singleton's petition for resentencing

Singleton makes two arguments why the trial court's order should be reversed.  First, "principles underlying the right to trial by jury and the principle of issue preclusion" require reversal.  Second, there is insufficient evidence he acted with reckless indifference to human life under *Banks* and *Clark*.

A. *Section 1172.6 does not violate the right to a jury trial or due process*

Emphasizing that two juries were unable to convict him of the at-issue crimes, Singleton argues that section 1172.6 violates his Sixth Amendment right to a jury trial and due process rights because a judge and not a jury made factual determinations about his conduct.  He cites *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, which held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" must be found by a jury, except that "the fact of a prior conviction" may be found by the court.  *Apprendi*, however, has no application here.  Resentencing statutes like section 1172.6 do not trigger the right to a jury trial because they are ameliorative sentencing statutes that do not arise until after a final conviction. (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156; accord, *People v. Silva* (2021) 72 Cal.App.5th 505, 520–522.)  Section 1172.6 is an act of lenity that reduces the offense for which a defendant was properly convicted.  (*People v. James* (2021) 63 Cal.App.5th 604, 609; *Anthony*, at p. 1156.)  As such, the

22

retroactive relief that section 1172.6 affords is not subject to Sixth Amendment analysis. (*James*, at p. 609, *Anthony*, at p. 1156.)

Nor does section 1172.6 offend due process. (See *People v. Silva, supra*, 72 Cal.App.5th at pp. 523–524.) The statute restricts the trial court's fact finding to determine eligibility to defined evidence presented at a noticed evidentiary hearing, at which the petitioner has an opportunity to be heard and to present evidence. (§ 1172.6, subd. (d)(3).) Singleton makes no contention that the trial court did not follow those requirements.

B.  *Reckless indifference to human life*

Singleton next contends that there was insufficient evidence he acted with reckless indifference to human life.[9] We disagree.

Singleton does not dispute that he and at least some of his accomplices were armed. While Singleton's mere knowledge that he and his accomplices were armed is insufficient by itself to establish reckless indifference to human life, it is not irrelevant. (*Clark, supra*, 63 Cal.4th at p. 617; accord, *In re Scoggins, supra*, 9 Cal.5th at p. 682 [anyone who plans or participates in armed robbery anticipates lethal violence might be used, given that one in 200 armed robberies results in death, even though that alone does not establish reckless indifference to human life].) Rather, that Singleton and at least one other accomplice were armed is relevant to the required mens rea and weighs in favor of the trial court's conclusion, even if it is not dispositive.

---

[9]  We treat Singleton's failure to address whether he was a major participant as a concession there was sufficient evidence of that prong.

Further, while the initial plan might not have involved shooting the security guard, evidence of Singleton's presence during and proximity to the murder and events leading to it "may be particularly significant where, as in *Tison*, the murder is a culmination or a foreseeable result of several intermediate steps." (*Clark*, *supra*, 63 Cal.4th at p. 619; see, e.g., *People v. Nieber* (2022) 82 Cal.App.5th 458, 479; *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 592 ["Mitchell was physically present at every stage of the crime: planning, execution, dividing the spoils, and flight."].) Here, before any shots were fired, Jose L. saw three men wandering the store without picking up any items to buy. After hearing a gunshot, Jose L. saw one of the men holding a gun to Marissa A.'s head. Although it is not clear which of the three men was Singleton, there is nonetheless evidence he was in close proximity to the security guard and to Marissa A. when a cohort was holding a gun to her head. Both Howard and Bridges identified Singleton as one of the men who fought with the security guard. Once encountering resistance from the security guard, Singleton could have desisted or tried to restrain his accomplice from shooting him or from pointing a gun at Marissa A.'s head. Instead, Singleton helped restrain the security guard, enabling his accomplice to shoot him. And there is no evidence he tried to help Marissa A. These actions exhibited a reckless indifference to human life. (See *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant enabled murder by using gun to keep victims at bay during bank robbery].) This case is therefore not like ones in which the defendant had no opportunity to intervene. (Compare *In re Scoggins*, *supra*, 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *People v. Ramirez* (2021) 71 Cal.App.5th

24

970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant present during robbery but not " 'close enough' " to restrain shooter].)

There is also no evidence that Singleton tried to minimize the risk of violence. To the contrary, he and the others planned the robbery for a time (late morning) and place (a busy market where people would be shopping and employees were working) that posed a high risk of violence. (Compare *People v. Owens* (2022) 78 Cal.App.5th 1015, 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed], with *Clark*, *supra*, 63 Cal.4th at pp. 621–622 [plan to rob closed store minimized risk of violence]; *In re Scoggins*, *supra*, 9 Cal.5th at p. 677 [defendant's plan to beat victim and steal his money did not involve use of weapons].)

As for what Singleton knew before going into the store about any propensity for violence his accomplices might have had, there is no evidence about this factor, other than that the participants were gang members. Mere comembership in a gang does not by itself establish knowledge of a propensity for violence. (See, e.g., *In re Miller* (2017) 14 Cal.App.5th 960, 976 [although defendant and killer belonged to same gang and had committed follow-home robberies together, no evidence they had participated in shootings, murder, or attempted murder].) Even so, once the robbers were in the market, one of them fired a gunshot into the ceiling near the front of the store, where, the evidence shows, Singleton was. Although this was apparently a warning shot to customers and employees to get down, it was an extremely

25

reckless and violent act. Assuming Singleton was not the person who fired into the ceiling, Singleton would have been alerted at that point to his accomplice's willingness to commit a violent act, if not a propensity for it. (See *People v. Nieber*, *supra*, 82 Cal.App.5th at p. 479 [although Nieber did not know about cohorts' likelihood of killing, "he was aware they brought a weapon, which they were using"].) Yet, there is no evidence Singleton then tried to tamp down the violence or extricate himself from the situation. Instead, as we have said, he increased the level of violence by fighting with the security guard.

The next factor we examine is the crime's duration, because there is generally a greater opportunity for violence when victims are held at gunpoint or restrained for prolonged periods. (*Clark*, *supra*, 63 Cal.4th at p. 620.) It is unclear how long the robbery lasted. But one of the robbers held a gun to Marissa A.'s head and forced her to open the cash register. Even if Singleton was not the man who did this, the evidence supports the reasonable inference that Singleton was in proximity to him, and, as we have said, did not intervene to help Marissa A.

Singleton also failed to aid the wounded security guard. Instead, Singleton or one of his cohorts robbed the security guard of his gun. Such callous behavior supports the reckless indifference finding. (See generally *Clark*, *supra*, 63 Cal.4th at p. 619; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to aid or comfort victim]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].)

In evaluating the sufficiency of this evidence to support the trial court's finding, we are mindful that no one *Clark* factor " 'is

26

necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.)  Rather, we evaluate the factors under the totality of the circumstances to determine Singleton's place on the culpability spectrum.  (*In re Scoggins*, *supra*, 9 Cal.5th at p. 675.)  To be sure, certain factors weigh against a reckless indifference finding:  the shooting appears not to have been preplanned and there is no evidence Singleton knew his accomplices had a propensity for violence before entering the market.  But other factors weigh in favor of the reckless indifference finding:  they executed the robbery during regular business hours in a market where customers, including children, and employees would be present; the plan involved moving victims at gunpoint; Singleton was in close proximity to the violent events but did not intervene; and he did not help the dying Hernandez.  We therefore conclude that substantial evidence supports the trial court's conclusion that Singleton acted with reckless indifference to human life.

V.     Howard's petition for resentencing

Howard's jury found personal gun use allegations not true. However, at his section 1172.6 evidentiary hearing, the trial court said it could disregard that jury finding.  The trial court ultimately found that Howard was "armed" and therefore was a major participant in the robbery who acted with reckless indifference to human life.  Howard now contends that the trial court could not make a finding in contravention of the jury's finding.  We agree.

The issue is:  what is the effect of a jury finding at a subsequent section 1172.6 proceeding?  Two Courts of Appeal have analyzed the issue—*People v. Cooper* (2022) 77 Cal.App.5th 393, 397 (*Cooper*) by analogizing a section 1172.6 proceeding to

27

one under Proposition 36, and *People v. Arnold* (2023) 93 Cal.App.5th 376 (*Arnold*) under the issue preclusion doctrine.

In *Cooper*, *supra*, 77 Cal.App.5th at page 397, a jury convicted the defendant of murder and kidnapping, found true a principal gun use allegation, and acquitted him of being a felon in possession of a firearm. Thereafter, Cooper petitioned for section 1172.6 relief. At the evidentiary hearing, the parties did not introduce new or additional evidence. (*Cooper*, at p. 398.) The trial court denied relief, finding that Cooper was a major participant who acted with reckless indifference to human life because he fired a gun. This finding contradicted his acquittal on the charge of being a felon in possession of a firearm. The appellate court reversed the trial court's order, concluding that "a trial court cannot deny relief in a section [1172.6] proceeding based on findings that are inconsistent with a previous acquittal when no evidence other than that introduced at trial is presented." (*Ibid.*; accord, *People v. Henley* (2022) 85 Cal.App.5th 1003.) In reaching that conclusion, *Cooper* analogized section 1172.6 proceedings to proceedings under Proposition 36, which created a procedure to allow some persons serving third strike sentences to seek resentencing. *Cooper*, at page 413, thus noted that appellate courts interpreting Proposition 36's resentencing scheme had found that trial courts could not deny a petition by "relying on factual determinations about the defendant's gun use that 'turn[ed] acquittals and not-true enhancement findings [at trial] into their opposites.'"

*Cooper* declined to decide whether the same conclusion could be reached under issue preclusion principles. However, *Arnold*, *supra*, 93 Cal.App.5th 376 found it could. In *Arnold*, at page 379, a jury found the defendant guilty of murder in the

28

stabbing death of a man during a brawl. But the jury found not true an allegation that the defendant personally used a knife. (*Ibid.*) Defendant petitioned for section 1172.6 relief. At the evidentiary hearing, the parties did not introduce any new or additional evidence. (*Arnold*, at p. 382.) The trial court denied relief, finding Arnold to be the actual killer, that is, he stabbed the victim. (*Ibid.*)

The appellate court concluded that the trial court was precluded from so finding. (*Arnold, supra,* 93 Cal.App.5th at pp. 386–387.) Issue preclusion bars relitigating previously decided issues. It applies (1) after final adjudication (2) of an identical issue (3) that was actually litigated and decided in a former proceeding, and (4) can only be asserted against a party to the former proceeding. (*Id.* at p. 386, citing *Strong, supra,* 13 Cal.5th at p. 716.) *Arnold* found that all requirements of issue preclusion were present. Specifically, the *Arnold* jury was instructed that, to find the personal use of a knife allegation true, it had to determine whether the defendant displayed the knife in an intentionally menacing manner or intentionally struck a person with it. (*Arnold,* at p. 386.) The jury "necessarily decided the issue in rendering its not true finding on the knife use allegation." (*Id.* at p. 387.) As the other elements of issue preclusion were met, the doctrine applied.

We agree with *Arnold*: issue preclusion bars relitigating a jury's factual findings at a section 1172.6, subdivision (d)(3) evidentiary hearing. *Arnold* observed that our California Supreme Court has suggested as much. The court in *Strong, supra,* 13 Cal.5th 698, considered whether pre-*Banks* and *Clark* special circumstance findings always foreclose relief in section 1172.6 proceedings. *Strong*, at page 715, acknowledged that

29

issue preclusion generally will govern whether a prior finding will be given preclusive effect in a later proceeding. (See also *People v. Curiel* (2023) 15 Cal.5th 433, 453 [noting its prior observation in *Strong* that "a relevant jury finding is generally preclusive in" § 1172.6 proceedings].) However, *Strong*, at page 716, declined to apply issue preclusion based on an equitable exception to it, where there has been a significant change in the law. *Banks* and *Clark* had significantly changed the law regarding what factual findings are necessary to find a person is a major participant in an underlying felony who acts with reckless indifference to human life. Therefore, pre-*Banks* and *Clark* findings did not have preclusive effect.

Here, there is no intervening law concerning a personal firearm use allegation. (See, e.g., *People v. Curiel*, *supra*, 15 Cal.5th at p. 455 [defendant did not identify similar change in law as in *Strong* to justify departure from general rule of issue preclusion].) Rather, Howard's jury was instructed that use of a firearm meant he "intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it." (CALJIC No. 17.19.) The jury, however, did not find that Howard displayed his gun menacingly, fired his gun, or hit someone with it. That jury finding should have been given preclusive effect at the section 1172.6 hearing.

*People v. Santamaria* (1994) 8 Cal.4th 903 (*Santamaria*) does not show that issue preclusion is inapplicable here, as the Attorney General argues. In that case, the victim had been stabbed, strangled, and run over by a car. (*Id.* at p. 908.) Two men, including Santamaria, were involved in the victim's death, but only Santamaria was tried for special circumstance murder committed during a robbery and with personally using a knife

30

during the crime. (*Ibid.*) At Santamaria's trial, his accomplice, who had entered into a plea deal, testified against him. The jury convicted Santamaria of murder but found the knife-use allegation not true. (*Id.* at p. 909.) The court of appeal reversed the murder conviction based on a procedural error in allowing a continuance and remanded for a new trial.

The parties agreed that Santamaria could not be retried on the knife-use allegation. (*Santamaria, supra*, 8 Cal.4th at p. 910.) However, Santamaria also urged that the jury's finding precluded retrial of the murder charge on a theory he personally used a knife. (*Id.* at pp. 911–912.) *Santamaria*, at page 917, noted that the jury's acquittal on the knife allegation and conviction on the murder and robbery charges involved different issues. The verdict showed that the jury had a reasonable doubt that Santamaria "specifically used a knife. *It does not show the reverse, that the jury specifically found defendant was an aider and abettor. . . .* The jury may merely have believed, and most likely did believe, that defendant was guilty of murder as either a personal knife user or an aider and abettor but *it may have been uncertain exactly which role defendant played*," which would explain the split verdict. (*Id.* at p. 919.) The jury therefore might have reasonably doubted Santamaria was the direct perpetrator and similarly doubted he was the aider and abettor, but had "no such doubt that he was one or the other." (*Ibid.*) As unanimity on the *theory* of murder is not required, the jury could properly find him guilty of murder.

The court of appeal thus concluded that the issue decided by the knife-use verdict and the one the defense wanted precluded in the murder retrial were not identical. (*Santamaria, supra*, 8 Cal.4th at p. 920.) "Although defendant claims he

merely seeks to preclude the theory that he used the knife, he necessarily is claiming more; he seeks to preclude the theory, and evidence to support the theory, that he *either* used the knife *or* aided and abetted the one who did. This, however, is not the issue decided regarding the enhancement allegation. Whether defendant specifically used a knife is one question; we may assume the prosecution did not prove that beyond a reasonable doubt, which explains the not true enhancement verdict. Whether defendant committed murder by either using a knife or aiding and abetting the one who did is quite a different question; the prosecution *did* prove that to the jury's satisfaction." (*Ibid.*)

*Santamaria* does not prevent applying issue preclusion here. (See, e.g., *Arnold*, *supra*, 93 Cal.App.5th at p. 388.) *Santamaria* involved a retrial at which the second jury would have to determine whether the defendant was guilty beyond a reasonable doubt of murder. The jury's acquittal on the knife allegation precluded the prosecution on retrial from recharging the defendant with a personal-use-of-a-knife enhancement; however, the prosecution was not precluded from introducing evidence that the defendant used a knife to show that he was guilty of murder.

Procedurally, this case involves a postconviction resentencing hearing under section 1172.6, subdivision (d)(3), at which the trial court had to determine beyond a reasonable doubt whether Howard could be guilty of murder under a valid theory based on the record of conviction (which includes the jury's instructions and verdict), as no new or additional evidence was

introduced.[10]  In this case, the jury's not true finding on the personal gun use allegations precluded the trial court from finding that Howard shot the security guard, brandished the gun menacingly, or hit someone with it; however, the jury's verdict would not preclude the trial court from finding that Howard, who admitted he entered Big Saver armed, had a gun to support the theory he exhibited reckless indifference to human life.  Stated otherwise, the trial court at the section 1172.6 proceeding could consider evidence that Howard possessed the gun during the robbery to support the murder conviction, so long as any finding did not contravene the jury's finding that Howard did not shoot, brandish it menacingly, or hit someone with it.

It is unclear, however, whether the trial court properly considered the preclusive effect of the jury's finding at the evidentiary hearing.  When defense counsel said the jury finding established Howard was not the actual shooter, the trial court immediately responded, "I understand that.  That does not preclude me from finding he is an actual shooter."  On this point, the trial court was wrong.  This is exactly what the jury's prior finding precluded.  Then, when it became the prosecutor's turn to argue, she cited *Cooper*, and, based thereon, said she was not asking the trial court to find Howard was the actual killer or waved his gun in a menacing manner.  She added, "But that does not preclude the court from finding that he personally was armed with that firearm and had the intention of using it, if necessary,

---

[10]    The preclusive effect of a jury finding at an evidentiary hearing at which new or additional evidence is introduced is not before us.  (See, e.g., *People v. Henley*, *supra*, 85 Cal.App.5th 1003 [addressing preclusive effect of jury finding at later § 1172.6 evidentiary hearing where defendant testified].)

or even had it at the ready or displayed it in a non-menacing manner." After hearing both parties' arguments, the trial court did not respond directly to the prosecutor's concessions. Instead, the trial court ruled, finding, among other things, that Howard "was *armed* and his job was to hold up" the security guard, and he and others did so. (Italics added.)

The presence of a gun and the role it played in the robbery are critical to evaluating the *Banks/Clark* factors. (See, e.g., *Cooper*, *supra*, 77 Cal.App.5th at p. 418 [although improperly considered gun evidence was not only evidence of mens rea, it was "crucial" to it]; *People v. Henley*, *supra*, 85 Cal.App.5th at p. 1021 [same].) Based on counsel's arguments and the trial court's statements, it is unclear what, if anything, the trial court found about Howard and his gun, other than that he was armed with it. We cannot find, especially based on the trial court's express statement that it could find that Howard was the actual shooter, that it did not then improperly do so. We therefore find sufficient uncertainty in the record as to whether the trial court disregarded the jury's finding in reaching its conclusion. Where, as here, it is " 'uncertain whether the trial court would have reached the same result using correct legal standards,' " it is appropriate to remand the matter for a new hearing to determine whether the prosecution proved, beyond a reasonable doubt, that defendant is guilty under any of these alternative permissible theories. (*People v. Reyes*, *supra*, 14 Cal.5th at p. 992; *Arnold*, *supra*, 93 Cal.App.5th at p. 391.)

To the extent the trial court based its evaluation of the *Banks/Clark* factors on a finding that contravened the jury's not true finding on the personal gun use allegations, remand is

proper. We express no opinion about what the outcome should be on remand.[11]

---

[11] Howard makes no argument on appeal that the evidence is insufficient to support a finding under a valid theory of murder, including that he was a major participant in the robbery who acted with reckless indifference to human life. We therefore treat that as a concession about the sufficiency of the evidence and agree that remand for another evidentiary hearing is the proper remedy.

## DISPOSITION

The order denying Singleton's petition is affirmed.  The order denying Reginald Howard's Penal Code section 1172.6 petition is reversed and the matter is remanded for the trial court to conduct another evidentiary hearing.  At that evidentiary hearing, the trial court shall not make any finding that contradicts the jury's finding not true the personal use of a gun allegations.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.

36